# EXHIBIT 1

Roger H. Gray, M.D.
73 Lexington Street
Newton, MA 02466
(617) 965-2713

February 25, 2013

Forensic Psychiatric Evaluation
Re: Jacques Wajsfelner
Dob: 03/31/29

I have been asked by Attorney Jeffrey A. Denner, who represents Mr. Wajsfelner, to perform a psychiatric evaluation of Mr. Wajsfelner for the purpose of assisting the Court in determining an appropriate sentence. Mr. Wajsfelner has pled guilty to 1 Count of failure to file report of foreign bank and financial accounts.

I have prepared this report after interviewing Mr. Wajsfelner for 3 hours on 1/18/13 and 2/25/13, interviewing his wife, Catherine Wajsfelner, reviewing the 12/19/12 Presentence Investigation Report prepared by Emily P. Frankelis, Senior U.S. Probation Officer, and the 2/21/13 Response to Presentence Investigation Report. I have discussed the case with Attorney Denner.

Brief History:

Mr. Wajsfelner, who will be 84 years old in one month, is a married, Caucasian male who lives in Weston, Massachusetts. His first wife died in 2007 after 50 years of marriage, and he has a 51 year old son and two grandchildren from that marriage. He remarried 2 years ago. He has a brother, now 88 years old, who has been suffering with dementia for the last 4-5 years and currently lives in Switzerland.

Probation Officer Frankelis has provided helpful history which I will not repeat, but I will offer some additional information which I hope will be helpful. As Officer Frankelis indicated, Mr. Wajsfelner was born in Germany as the Nazis were coming to power. His mother was German, and his father was a Polish Jew. The Polish Government mandated that she had to become a Polish national because she married a Polish citizen. In addition, the Polish Government did not recognize a marriage unless it was a religious marriage; therefore, his mother converted to Judaism. Consequently, Mr. Wajsfelner and his brother were Polish Nationals and Jewish.

When Mr. Wajsfelner was 4 years old, his father died in 1933. Mr. Wajsfelner lived with his brother and their mother, and they had positive and supportive

1

relationships. Life gradually became more difficult and threatening. Around 1939, when the Nazis invaded Poland, where Mr. Wajsfelner's paternal aunt and her family lived. "They [Nazis] locked them up in the house and burned it...the whole family." Not long thereafter, his mother decided to send him and his brother to boarding school in Switzerland to avoid the Nazis. Her mother paid their tuition out of her German bank account, but in 1943 the Nazis froze her (and others') bank accounts with the result that she could no longer pay tuition. The two boys were ordered back to Germany because of non-payment of tuition. The family attempted to negotiate a plan whereby tuition would be paid after the war; however, this plan was rejected. Mr. Wajsfelner indicated that the school sports instructor was a Nazi spy, adding that the school they attended owned the building where the German Consulate was housed. He understood that the Nazis threatened to send his mother, who then lived in Hamburg, to a concentration camp if the brothers were allowed to stay at the school and delay payment of tuition. Reflecting on this aspect of their experience, Mr. Wajsfelner observed that if they had had a non-German bank account, their tuition would have been paid and they could have remained in Switzerland. Because they lacked that particular safety net, they were returned to Germany in February of 1943 and were considered "enemies of the Reich."

On their return to Hamburg, Mr. Wajsfelner's brother was "drafted" into a forced labor camp where he worked without pay 7 days a week to support the Third Reich. When Mr. Wajsfelner became eligible for forced labor in February of 1945, he "just disappeared...I didn't go." Instead, he helped provide for his mother and brother by riding his bicycle across the German front into "no man's land" – the area in between the Allied and Axis front lines - where he would get margarine in burlap sacks and then use it to barter for food. He was fired at by British troops as he was attempting to bring margarine back to support his family. The family lived in terror of being killed, and they slept with handguns under their pillows. "We were ready to kill if anyone came through the door...I've dreamt about it my whole life...what would I have done...what would they have done to my Mother." They were forever in fear that they too would become part of "The Final Solution."

The mayor of Hamburg surrendered to the Allied Forces in April of 1945, with no further losses to the family. Mr. Wajsfelner stayed in Germany except for about nine months of schooling in London. He immigrated to the United States in 1950, and began working in New York. He was drafted into the U.S. Army in 1951, noting the irony that he was still technically an "enemy alien" since Germany had surrendered but not signed a Peace Treaty. He said that he received medals and recognition for "meritorious service" and proudly related his service to our country.

After his Honorable Discharge in August of 1953, Mr. Wajsfelner returned to New York where he was successful in a variety of businesses, ultimately developing his own advertising business and investing in real estate. There is no history of prior legal problems other than as a plaintiff in evictions from his apartment buildings.

2

Mr. Wajsfelner denies a history of mental illness or substance abuse; however, he describes thinking almost daily about his childhood experiences in Europe. "I mainly think about those things at night...during the day when I'm busy, I'm involved and distracted by other things, but at night, especially at bedtime, I think about what happened...what could have happened to my Mother." He acknowledges frequent dreams about those years. He reflected, with some frustration, that the Jews of Germany, considering themselves "Germans first and Jews second," did not think Hitler would actually kill them, "but it was all right there, in the first 50 pages of 'Mein Kampf.'" He talked about how the German Government "kept changing the laws, according to whatever they needed." Mr. Wajsfelner said, "I don't understand why, but as I get older, I think about those times more and more."

We discussed the offense conduct, noting that he did not need – from a financial viewpoint – to hide money from the U.S. Government. As the Presentence Report indicates, he has a total net worth of over fourteen million dollars, and could well afford the taxes and the consequent substantial penalty. Mr. Wajsfelner told me that he pled guilty and accepts responsibility for his actions. He did not excuse his behavior. I asked about his motivation. He said, "The reason was not to evade taxes but to have an anchor to windward." When asked to explain what he meant, he described the life-long and pervasive fear of what governments could do to people and the need for "a safety net...a backup plan." He noted that the Nazis froze people's assets, stole, and mandated that investment money had to be invested in Nazi bonds. "If my Mother had had money in a Swiss bank, my brother and I could have stayed in Switzerland...we wouldn't have been returned to Germany."

Mr. Wajsfelner reports that his health is "good" but that he has trouble with walking and with his memory. He takes Lisinopril for hypertension. His wife notes that, "He is stoic...he doesn't complain." When pressed, he admits that he needs a cane for walking, especially beyond his home, and has some problems with his memory, "though I remember things from the past very clearly." He admits that he forgets where he puts things, and sometimes "I forget what I'm doing." His wife described his becoming spatially disoriented at times. For instance, "Just a few days ago, we went on an errand, parked the car and walked into the store. A few minutes later, he walked out and couldn't find the car even though it was right there in front of us." Both of them acknowledge that he repeats stories, has trouble with names, and misplaces familiar objects with increasing frequency. He describes dizziness, especially when moving from a lying or sitting position to standing up. His wife describes him tripping and sometimes falling. Both of them appear to minimize the associated risks and the seriousness of his symptoms.

Mental Status Examination:

I began our interviews by clarifying that the purpose was forensic rather than treatment, that information would not be held confidential, that he could answer questions selectively if he wished, and could stop the interviews at any time. He

3

repeated this information in his own words, and in my opinion, he understood the conditions.

Mr. Wajsnfelner was neatly dressed and groomed, walked with a cane, and was fully cooperative. He was oriented to time, person, place, and circumstance. His speech was of normal rate, pressure, prosody, and volume. His major concern focused on his wife and son. He denied thoughts of harming himself or others. There was no evidence of psychosis. He described his mood as "positive," and affect was mood congruent, with reasonable range; however, there was a persistent quality of minimizing problems – past and present – and an implied resilience in the face of terrible vicissitudes, such as living through the Nazi era firsthand. Cognitive functioning showed a reasonable fund of knowledge, good abstraction, some difficulty with concentration and staying focused. He was able to do serial 7 subtractions with difficulty and hesitation, with subtraction to 65 before stopping. He correctly named Presidents Obama, "Bush, Jr., Bush, Sr., and that guy in between." He reported that he had been very active in the Republican Party, but he had difficulty remembering the name of the committee on which he worked. Insight was good, and judgment was good.

Family History:

His father died of heart disease in 1933. His mother died in 1994 at the age of 100. His 88 year old brother has severe dementia. Two paternal aunts died with dementia. There is no known history of mental illness or substance abuse.

Discussion:

Mr. Wajsfelner is a man who presents a number of issues involving the offense conduct and the legal consequences. First, we have the dilemma of motivation and psychological functioning. On the face of it, his behavior does not make sense. He is a man with no history of illegal behavior, mental illness, substance abuse, or social maladjustment. He was successful in business, active in the Republic party, had a successful and admirable military record, a long and happy first marriage, a happy second marriage, and substantial reported assets. There was no apparent financial need to have unreported funds in a foreign bank account. There is nothing in his available history to indicate basic dishonesty or antisocial attitudes. What his history provides is an answer to otherwise irrational behavior: fear. Mr. Wajsfelner grew up in circumstances that promoted mistrust of governments and reasonable fears of being killed. Mr. Wajsfelner, his brother, and their mother, were fortunate to survive that era, and he quietly and stoically carries the memories of "living on the edge" in a society where survival of the fittest was the driving philosophic foundation.

Mr. Wajsfelner has key components of Posttraumatic Stress Disorder,(DSM-IV-TR # 309.81), though he does not necessarily meet full diagnostic criteria. He experienced terrifying, life-threatening events in which he felt profound fear. He

4

has recurrent and intrusive recollections of these events as well as recurrent dreams about them. The intrusive and obsessive memories have increased with age. He generally avoids conversations about these experiences, has diminished interest and participation in significant activities, struggles with remembering particular aspects of multiple traumata, and is particularly sensitive to loud noise. He tends to minimize some of the somatic symptoms such as difficulty with sleep and concentration. His symptoms have lasted for years and are worsening, particularly in light of memory impairment which typically preserves long-term memory while demonstrating short-term memory problems. Finally, and most significantly, these traumatic experiences and their psychological impact, severely impaired his judgment which was expressed in unreported foreign accounts. He wanted a safe haven in the country where he had been safe - only briefly - from the Nazis. Had his judgment not been so impaired by these experiences, he could well have established safe havens without violating the law or putting himself at risk.

While Mr. Wajsfelner's Posttraumatic Stress Disorder predicated upon his past experiences significantly contributed to the offense conduct, his present and inevitably future condition also become an important factor in determining the consequences of his actions. He is now almost 84 years old. He shows evidence of early dementia. There is clear evidence of memory impairment which will increasingly diminish his capacity to function as he ages. He has a very strong family history of dementia, which is a poor prognostic indicator. In addition, he has hypertension, symptoms of postural hypotension, dizziness, impaired walking, increasing reliance on a cane, and recent falls. Each one of these factors alone carries risk of progressive decline. When considered together, these risk factors combine to substantially increase and magnify the likelihood of even faster physical and mental deterioration.

Conclusion:

In my opinion, to a reasonable degree of medical/psychiatric certainty, Mr. Wajsfelner's physical and mental conditions put him at severe risk if he is incarcerated. The likelihood of physical and neurological deterioration will be markedly heightened, and he would be very vulnerable to the problems typical of incarceration environments. The likelihood of re-offense is extremely low and the risk to society is extremely low. In my opinion, his symptoms of Posttraumatic Stress Disorder significantly contributed to the offense conduct. The potential costs of incarceration to both society and Mr. Wajsfelner are very high. His past does not justify his illegal actions; however, it may help us understand why a law abiding and rational man would behave in an irrational and illegal way.

Respectfully submitted,

Roger H. Gray, M.D.

Curriculum Vitae

Roger H. Gray, M.D.
112 Sargent Street
Newton, Massachusetts
(617) 965-2713
DOB: January 14, 1945

I.  Education
    A. University of Minnesota, B.A., English Literature, 1968
    B. University of Minnesota, School of Architecture, 1967-69
    C. Tufts University, School of Medicine, M.D. Boston, MA 1973-77

II. Post-Graduate Training: Tufts –New England Medical Center and Affiliates
    A. Medical Internship: July 1977-June 1978 at the Shattuck, Faulkner, and Jamaica Plain V.A. Hospitals
    B. Psychiatric Training:
        1. Jamaica Plain V.A. Hospital: July 1978-June 1979
        2. New England Medical Center: July 1979-June 1980
        3. Jamaica Plain V.A. Hospital: July 1980-June 1981, Chief Resident, Ward 12 C (In-Patient Service)
        4. New England Medical Center: July 1980-June 1981

III. Work Experience:
    A. Private Practice: July 1981 to present. Psychotherapy and pharmacotherapy with adults, adolescents, and couples. Extensive treatment and evaluation of victims and perpetrators of abuse and trauma Psychotherapy supervision and consultation, forensic evaluations

    B. Medical Director, Adult Psychiatric Unit, Caritas Norwood Hospital: October 1999 to February 2006
        Responsibilities included: direct patient care, supervision of other psychiatrists, Oversight and supervision of milieu staff, program development, Peer Review Committee, Quality Assurance Committee, Utilization Review, development and implementation of Suicide Risk Assessment Protocol, ECT Practice Committee, Restraint Reduction Committee, Performance Improvement Committee, consultation-liaison services to general medical/surgical Service, consultation to Substance Abuse Treatment Program, and Emergency Department Staff.

C. Associate Medical Director, Adult Psychiatric Unit, Southwood Community Hospital: April 1994-October 1999. Duties as described above.

D. Associate Medical Director, Geropsychiatric Unit, Southwood Community Hospital: January 1992-October 1994  Duties as described above.

E. Medical Director, Partial Hospital Program, Southwood Community Hospital

F. Medical Director, Psychiatric Service, Northeastern University Student Health Service  April 1992- April 1994. Duties included: direct patient Care, collaboration with Counseling Dept., consultation to teaching and administrative staff, development of managed care protocol, consultation to and instruction of staff of resident halls, supervision of other mental health providers.

G. Medical and Clinical Director, American Geriatric Services, Inc.: November 1988-December 1991. Duties included development and administration of inpatient medical-psychiatry services and out-patient mental health services for elderly patients, direct services to patients, training and supervision of of multi-disciplinary teams, development of Utilization Review and Quality Assurance Programs. Patient cohort over 3,000.

H. Staff Psychiatrist, Consultation-Liaison Service, and Supervisor of Psychiatry Residents, Beth Israel Hospital, Boston, MA and Harvard Medical School July 1988-1990

I. Psychiatric Consultant, St. Margaret's Hospital, Dorchester, MA: September 1987-January 1989

J. Carney Hospital, Dorchester, MA: December 1983-June 1988
   1. Director of Psychiatric Consultation-Liaison Service. Duties included providing and coordinating psychiatric services to medical/surgical services, instructing primary care residents, formulation of policies, consultation to staff of coronary care unit.
   2. In-Patient Attending Psychiatrist: December 1983-September 1986
   3. Teaching primary care residents and directing house officers' group 1984-1987
   4. Psychotherapy supervision of nursing graduate students 1984-1986
   5. Grand Rounds for Departments of Psychiatry and Medicine

K. Attending Psychiatrist, Cambridge Hospital In-Patient Psychiatry Service, Cambridge, MA. Duties included supervision of psychiatric residents, psychology interns, and medical students. July 1981- December 1983

L. Medical Director, 735 Inc., Melrose, MA  Outpatient Mental Health Clinic July 1981-December 1983

    M.   Forensic consultations: 1983- present

    N.   Adolescent Psychiatry Unit, Boston State Hospital 1969-1973
          Director, Sheltered Workshop and Vocational Training
          Activities Supervisor

IV.   Massachusetts License, Board of Registration and Discipline in Medicine, #43790
      Issued February 21, 1979
      American Board of Psychiatry and Neurology, #28364, issued November 1986

V.    Professional Affiliations
      Massachusetts Medical Society
      Massachusetts Psychiatric Society
      American Psychiatric Association
      American Academy of Psychiatry and the Law

VI.   Community Activities:
      Member, Dedham Board of Health, March 1985-March 1988

VII.  Publications
      A. Attleboro Sun Chronicle, columnist on mental health issues, October 1994-September 1997
      B. "Filming Adolescent Activities" Hospital and Community Psychiatry, August 1971
      C. "The Role of the Library in an Adolescent Service" Hospital and Community Psychiatry, May 1972 (with Anton O. Kris, M.D.)

VIII. Teaching

      Psychology Colloquium: Coping with Death and Dying, University of Puget Sound, October 30, 2007

      Guest Lecturer, Sargent College of Allied Health Sciences at Boston University, 1997-2004

      Presentation to Community Service Board at Rome Memorial Hospital, Rome, NY May 2, 2001

      Early Intervention – Suicide Prevention and Depression Among College Students, Northeastern University, October 2, 1993

      "Juggling the Generations" – issues in geriatrics, Women's Seminar,

Neponset Valley Health Systems, September 30, 1993

Workshop: Psychotherapy with Elderly Patients in Long Term Care Settings
Presented at the Northeastern Gerontological Society, Annual Conference,
Albany, NY, April 19, 1991

Workshop: Psychotherapy of Nursing Home Residents with Character
Disturbances, presented at the American Psychological Association,
1991 Annual Convention, San Francisco, California, August 20, 1991

Workshop: Psychotherapy with the Elderly
Conference: Treatment of the Behaviorally Disturbed Geriatric Patient,
Co-sponsored by Fuller Memorial Hospital, American Geriatric Services, and
Human Services of Southeastern Massachusetts, Mansfield, MA October 25, 1991

Workshop: The Wolf in Sheep's Clothing: Medical Illness and Psychiatric
Symptoms, presented at the Massachussetts School of Professional Psychology,
Dedham, MA, November 15, 1991

Faculty/Panelist, Massachusetts Continuing Legal Education
August 2008 – Forensic Psychiatry and the Vicissitudes of Memory
January 2009 – Psychiatric Issues in Restraining Order Enforcement

Forensic Experience

A. Criminal
   1. Commonwealth v. Fraser (Dedham District Court)
   2. Bridgewater State Hospital evaluations:
       a. assault and battery
       b. sexual offenses
       c. attempted murder
       d. murder
      Issues: competence to stand trial, criminal responsibility, dangerousness,
      parole applications, transfers to less restrictive settings, medications and
      treatment plans
   3. U.S. v. DelaCruz (United States District Court, District of Massachusetts)
   4. U.S. v. Kelly (United States District Court, District of Massachusetts)
   5. Knipfer v. State of New Hampshire
   6. State of New Hampshire v. Hilchey
   7. State of New Hampshire v. LaBarre
   8. Commonwealth of Massachusetts v. Bishop
   9. Testimony before Sexual Offender Registration Board, Commonwealth of
      Massachusetts
   10. Commonwealth v. Dell'Isola (Middlesex Superior Court)
   11. Elghorfi v. Bridgewater State Hospital (Plymouth Superior Court)

    12. Psychiatric Evaluations re Internet Sex Crimes

B. Civil
   1. Commitments (approximately 250)
   2. Psychiatric Damages (approximately 15)
   3. Independent Medical Evaluations (approximately 500)
   4. Medical Malpractice (5)

C. Training
   American Academy of Psychiatry and the Law:
   Board Review Course, October 2002
   Conference, October 2006
      Courses: Challenges in Correctional Psychiatry
               Insanity Defense
               Perspectives on Malingering
               False Allegations
               Two Views of Insanity
               Risk Assessment
               The Internet and Child Pornography
               NGRI Re-offending
   Conference, October 2007
      Courses: Assessment of Child Pornography Offenders
               Conceptual History of Psychopathy
               Forensic Evaluation of Problematic Internet Use
               Violent Offenders
               Treating Pedophilia
               Asperger Psychopathology and Internet Sexual Crimes
               The Treatment of Incarcerated Sex Offenders
               Forensic Applications of Video Game and Internet Addiction

D. Faculty of MCLE

   1. Panelist, Forensic Psychiatric & Legal Perspectives on Law & Memory (August, 2008)

   2. Panelist, Domestic Abuse (January, 2009)

E. Committee for Public Counsel Services

   1. Faculty/Panelist, CPCS Guardianship Seminar, Southeast Region (January, 2013)